IN THE UNITED STATES COURT
FOR THE DISTRICT OF PUERTO RICO

JORGE PARET-RUIZ,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

CIV. NO.: 11-1404(SCC)

## OPINION AND ORDER

Plaintiff Jorge Paret-Ruiz sued the Government under the Federal Tort Claims Act ("FTCA") alleging illegal arrest and related claims. Several claims were dismissed,[1] and a bench trial was held on the remaining claims on September 5, 2014.

---

**1.** The Court previously entered an Order dismissing Paret's claims against the Drug Enforcement Authority, finding that the United States was the only proper party; his claim for assault during his arrest; his constitutional takings claim; and his claims regarding injuries while imprisoned. *See* Docket No. 19.

The parties filed post-trial briefs. *See* Docket Nos. 94, 98.

## I. Background

The following facts are taken from the First Circuit's opinion in Paret's criminal trial. *See United States v. Paret-Ruiz*, 567 F.3d 1 (1st Cir. 2009). Apart from the procedural history, however, these facts are not established for the purposes of the present action;[2] instead, they are recited because they provide necessary context for Paret's FTCA claim.

According to the Government's case in the criminal trial, the DEA's involvement with Paret began in January 2004 when it was told by the FBI that one of its confidential informants ("CIs") had been approached by Paret in order to acquire a boat with which to import narcotics into Puerto Rico. *See id.* at

**2.** In its post-trial brief, the Government, rather than summarize the facts adduced at the bench trial, chose to summarize the facts discussed in the First Circuit's criminal opinion, which, according to the Government, were "already established before trial." Docket No. 94, at 2 (emphasis omitted). But the First Circuit made no findings of fact. Instead, in ruling on Paret's sufficiency-of-the-evidence claim, it construed the trial evidence "in the light most favorable to the verdict." *United States v. Paret-Ruiz*, 567 F.3d 1, 3 (1st Cir. 2009) (citing *United States v. DeCologero*, 530 F.3d 36, 47 (1st Cir. 2008)). Given that the conviction entered in the trial court has been vacated, and given that I have had the opportunity to hear the relevant testimony, I have no obligation to construe the evidence in the way that the First Circuit says the jury *could have* construed it. I make my own factual findings below.

3. On February 3, 2014, Paret met with DEA undercover Agent González and was shown a boat. *See id.* Paret claimed to have drug connections in Antigua and St. Maarten and indicated that he wanted to use the boat to import drugs to Puerto Rico. *See id.* Over the next couple months, Paret met and spoke repeatedly with Agent González and the CI. In these meetings, Paret would talk about his drug connections and his plans to bring drugs into Puerto Rico using Agent González's boat. Each time one of these plans came to fruition, though, some obstacle would appear and the delivery would fall through. At one point Paret was even given $2,000 by Agent González to take a trip to Antigua to confirm that there was cocaine there to bring back to Puerto Rico. Paret took the money, but he never took the trip.

Though the Government never found evidence of more than talking, it secured an indictment against Paret, along with two other individuals, on August 9, 2005. At trial, he was convicted of conspiring to possess with intent to distribute cocaine. On appeal, the First Circuit reversed the conviction and ordered the trial court to enter a verdict of not guilty. *Id.* at 8. It held that while there was sufficient evidence "for a reasonable jury to find that Paret-Ruiz wanted to make a deal

to transport drugs into Puerto Rico," there was insufficient evidence "for a reasonable jury to conclude that Paret-Ruiz had an agreement with anyone other than Agent González to work together to import and possess illegal drugs." *Id.* at 7–8.

**II. Findings of Fact**

Two witnesses testified at the bench trial: Paret and Agent González. Paret's testimony focused principally on adding context to the criminal trial's facts that he thought portrayed him in a more innocent light. Agent González's testimony, by contrast, mostly repeated his testimony from the criminal trial, but it added details about why he remains convinced that the investigation into Paret was a valid one.

Paret disputed that he had approached the CI, a man named Lázaro Herrera. Instead, Paret said that Herrera initially approached him, asking to purchase a boat that Paret had for sale. As Paret tells it, from that point forward it was Lazaro, and later Herrera and Agent González, working undercover, who broached the subject of important narcotics. In Paret's version, Herrera regularly visited Paret and offered him money to accompany him on various minor and not obviously illegal errands. Paret seems to have been happy to take Herrera's money, and he engaged with Herrera in

speculative talk about importing drugs.

Under false pretenses, says Paret, Herrera eventually brought him to Fajardo, where they met Agent González at a marina. Agent González had a vessel there, and he and Herrera insisted that Paret go aboard and test drive it. Agent González asked him to take the boat to St. Thomas to pick up drugs, and Paret said he told Agent González no.

Paret testified that he never had any intention of importing drugs, but his motives for telling Agent González about his supposed history of drug importation and drug connections is not entirely clear. Paret does claim to have suspected that Agent González and Lazaro were cops, and yet, in his own version, he played along. He admits, too, to taking the $2,000 Agent González offered him for a scouting mission, but he says he only asked for a loan and never intended to do anything that Agent González asked. Most of the rest of Paret's testimony was devoted to offering innocent explanations for incriminating recordings and to denying that he had any relationship with his co-defendants.

Agent González's testimony took the position that the investigation and arrest of Paret were valid. Agent González testified that they had identified Paret's associates—who Paret

testified never existed—as his co-defendants, but he did not entirely explain how the Government had come to that conclusion. Agent González also testified that he had no knowledge of cash payments to Paret beyond the $2,000, but he could not say whether or not the FBI or Herrera personally had paid Paret more. Agent González admitted that he had never seen any drugs and that none of the talked-about transactions ever came to fruition. Still, he seemed convinced that Paret was "the real deal," a serious drug trafficker.

At the end of the day, the Government offered nothing, beyond Paret's own statements, that even hinted that he might be "the real deal." Frankly, I discredit much of Paret's self-serving testimony, but at the end of the day I think that regardless of whether or not he suspected Herrera and Agent González were cops, he was playing them. I have doubts about whether Paret had any actual intent of importing narcotics with Agent González, but he was at least willing to pretend in the hopes of getting money without working. And whatever his motivation, Paret was happy to talk about his supposed exploits. Whether or not the intent existed in Paret's mind, it is easy to understand why Agent González believed in Paret's seriousness. Put bluntly, there was no reason to think that

Agent González knew Paret was lying, much less that he was investigating Paret for any impermissible purpose.

**II. Analysis**

This case went to trial on three claims: false arrest and imprisonment, malicious prosecution, and a non-constitutional claim for deprivation of property. Below, I take up each of these claims in turn.

**A. False Arrest and Imprisonment**

As an initial matter, the Government argues that these claims are time-barred. In fact, it originally made this argument in a motion to dismiss filed in August 2011. *See* Docket No. 10. Judge Gelpí, then presiding over this case, denied the Government's motion at the time, relying principally on the Supreme Court's decision in *Heck v. Humphrey*. Docket No. 19, at 7 (citing *Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994)). Two and a half years after the Court's ruling, the Government decided to seek reconsideration of that Order on the grounds that a later case, *Wallace v. Kato*, 549 U.S. 384 (2007), required dismissal. *See* Docket No. 88. That motion was denied because it was extremely untimely and, moreover, because its consideration would have interfered with the trial date. *See* Docket Nos. 90, 92.

At trial, however, the Government continued to press its *Wallace v. Kato* argument, making the claim that Judge Gelpí had "overlooked or ignored" *Wallace*. I have gone back and looked at the Government's original motion to dismiss, and it seems that while the Government has chosen to frame its motions to reconsider Judge Gelpí's ruling in a rather accusatory way, the Government itself "overlooked or ignored" *Wallace* too. Certainly, that case is not cited in the Government's frankly cursory discussion of the statute of limitations issue.[3] *See* Docket No. 10, at 9–10. It was never Judge Gelpí's duty to do the Government's work for it, finding the opinions that best made its case; that duty was the Government's alone.

As it turns out, the Government is correct that *Wallace* compels this Court to dismiss Plaintiffs false arrest and imprisonment claims, but not for the reason that the Government suggests. *Wallace* holds that false arrest and imprisonment refer to "detention *without legal process*." 549 U.S. at 389. Thus, no tort for false imprisonment may lie where the plaintiff was "held *pursuant to such process*." *Id.* This is because once a person

**3.** *Wallace* was decided in February 2007, four and a half years before the Government filed its initial motion to dismiss. *See* Docket No. 10 (filed Aug. 29, 2011).

is held pursuant to legal process, the proper claim is one for malicious prosecution, "which remedies detention accompanied, not by absence of legal process, but by *wrongful institution* of legal process." *Id.* at 390. Here, Paret was arrested pursuant to an arrest warrant and indictment, "a classic example of the institution of legal process." *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008). He was thus never held without legal process, and so, under *Wallace*, he cannot make a claim of false arrest or imprisonment. Of course, *Wallace* was decided as a matter of federal common law, not Puerto Rico law. But Puerto Rico cases on false arrest and imprisonment state explicitly that these torts have a common-law origin, and in formulating their elements the Supreme Court of Puerto Rico has relied on United States Supreme Court precedent. *See Ayala v. San Juan Racing Co.*, 12 P.R. Offic. Trans. 1012, 1021–22 (1982) (discussing the common law origins of false arrest and imprisonment actions).[4] As such, I am sure that if faced with this precise issue,

---

**4.** Notably, *Ayala* also relied on Prosser's *Law of Torts*, *see Ayala v. San Juan Racing Co.*, 12 P.R. Offic. Trans. 1012, 1021 (1982), a treatise on which *Wallace* also relied in defining the distinction between false imprisonment and malicious prosecution, *see Wallace v. Kato*, 549 U.S. 384, 389–90 (2007) (citing Prosser).

the Supreme Court of Puerto Rico would follow *Wallace*.[5] Accordingly, I must dismiss Paret's false arrest and imprisonment claims with prejudice.[6]

---

**5.** Prior to *Wallace*, cases from this district and the First Circuit assumed that claims for false arrest pursuant to legal process were valid. *See, e.g.*, *Abreu-Guzman v. Ford*, 241 F.3d 69, 75–76 (1st Cir. 2001); *Santana v. United States*, 919 F. Supp. 2d 558, 563 (D.P.R. 1996). *But see, e.g.*, *Calero-Colon v. Betancourt-Lebron*, 68 F.3d 1, 4 (1st Cir. 1995) ("The critical inquiry that distinguishes malicious prosecution from false arrest in the present context is whether the arrests were made pursuant to a warrant."). However, after *Wallace*, the First Circuit and many other Courts of Appeals have recognized that such claims are illusory. *See Harrington v. City of Nashua*, 610 F.3d 24, 29 (1st Cir. 2010) ("[T]he commencement of a criminal case by the institution of legal process marks the dividing line between claims of false imprisonment and claims of malicious prosecution . . . ."); *see also Myers v. Koopman*, 738 F.3d 1190, 1192 (10th Cir. 2013) ("Myers correctly styled his Fourth Amendment claim as one for malicious prosecution because he was seized after the institution of legal process."); *Harrington v. City of Council Bluffs, Iowa*, 678 F.3d 676, 682 (8th Cir. 2012) (similar); *Nat'l Cas. Co. v. McFatridge*, 604 F.3d 335, 344 (7th Cir. 2010) ("The false imprisonment ends, and the claim accrues when he is held pursuant to a warrant or other judicially issued process."); *Hudson v. Hubbard*, 358 F. App'x 116, 119 (11th Cir. 2009) (unpublished) ("Here, the named defendants caused or allowed Hudson to remain in prison pursuant to legal process, for which a false arrest or imprisonment claim does not lie." (internal quotations and brackets omitted)).

**6.** I note that the Government advocated this position in its motion for summary judgment, but it did so without citing *Wallace*. *See* Docket No. 40, at 3–4 (citing, *e.g.*, *Calero-Colon*, 68 F.3d at 4). Because I find that

**B. Malicious Prosecution**

Under Puerto Rico law, a malicious prosecution claim has four elements: (1) the defendants must have initiated a criminal action against the plaintiff; (2) the criminal action must have terminated in the plaintiff's favor; (3) the defendant must have acted without probable cause and with malice; and (4) the plaintiff must have suffered damages. *Barros-Villahermosa v. United States*, 642 F.3d 56, 58 (1st Cir. 2011). The Government disputes the third element, arguing that Paret failed to prove malice.

Here, I agree with the Government. As the First Circuit has noted, "Puerto Rico courts equate malice with bad faith." *Id.* at 59 (citing *Raldiris v. Levitt & Sons of P.R., Inc.*, 3 P.R. Offic. Trans. 1087 (1975)). But nothing in the record suggests bad faith on Agent González's part. To the contrary, the evidence at trial suggested that Agent González honestly believed—and *believes*—that Paret is a drug trafficker. I find that Agent González did not lie to the grand jury. At most, he might have misinterpreted some of his conversations with Paret—or been misled by Herrera—but neither of those occurrences, even if

*Wallace* requires dismissal, I reconsider the Court's previous ruling on this question on my own motion.

true, would support a finding of bad faith. Furthermore, the fact that the First Circuit found the evidence insufficient for conviction does not mean that Agent González acted in bad faith in testifying to the grand jury about what he understood to be Paret's conspiratorial actions. An indictment is issued on a finding of probable cause, and so may be properly issued even where the grand jury was not presented with evidence sufficient for conviction. Because Paret has not proved malice, his malicious prosecution claim fails.

**C. Deprivation of Property**

Finally, Paret challenges the forfeiture of certain property—two trucks and a boat—by the Government. Paret's claim is somewhat confusing, and it is not helped by his failure to offer into evidence a number of crucial documents that might have strengthened his case.

Paret's indictment included a criminal forfeiture count under 21 U.S.C. § 853. After Paret's conviction, the presiding judge entered an order of forfeiture against Paret in the amount of $20,000. It is unclear whether this amount was ever satisfied, but it is apparent that the criminal forfeiture order did not encompass the vehicles referred to above. Those vehicles, it seems, were instead the subject of a civil administra-

tive forfeiture proceeding before the DEA. When the First Circuit vacated Paret's conviction, the criminal forfeiture order was also vacated; the administrative forfeiture, however, had already become final and was not covered by the First Circuit's mandate. Though his post-trial brief conflates the two proceedings, it is only this administrative forfeiture proceeding that Paret is challenging.

The administrative forfeiture proceeding was carried out pursuant to 18 U.S.C. § 983. That statute provides that a person claiming an interest in property to be forfeited must file their claim by "the deadline set forth" in the letter putting the person on notice of the Government's intent to forfeit the property. 18 U.S.C. § 983(a)(2)(B). Here, it appears that Paret did file a claim within that period, but it was rejected by the DEA because it was not made "under oath, subject to penalty of perjury," as required by statute. JOINT EXH. XXIII (emphasis omitted); *see also* 18 U.S.C. § 983(a)(2)(C)(iii).[7] Whether the

---

**7.** The DEA also purported to reject the claim because it was signed by Paret's attorney, not Paret personally. The DEA generally cites 18 U.S.C. § 983(a)(2)(C) for the proposition that only the claimant can sign the claim, but that section contains no such requirement apart from the more specific provision that the claim be made under oath. The DEA's two reasons for rejecting the claim thus seem duplicative. An attorney

Government's characterization is accurate I do not know, because Paret failed to introduce the actual claim. However, it also appears that Paret re-filed his claim, but this time it was returned for being outside of the deadline. *See* JOINT EXH. XXIV. Again, I know nothing of the second application's content because of Paret's failure to introduce it.

Filing a claim under § 983 is the *exclusive* avenue for seeking a judicial determination in an administrative forfeiture case. *Can v. U.S. Drug Enforcement Agency*, 764 F. Supp. 2d 519, 520 (W.D.N.Y. 2011) (citing *Valderrama v. United States*, 417 F.3d 1189 (11th Cir. 2005)); *Martin v. Leonhart*, 717 F. Supp. 2d 92, 99–100 (D.D.C. 2010) ("[T]he filing of a claim by an aggrieved party is the exclusive means by which a claimant can have a judicial determination as to the forfeiture's validity."); *see also* 18 U.S.C. § 983(e)(5) ("A motion filed under this subsection shall be the *exclusive remedy* for seeking to set aside a declara-

should be permitted to file a claim on his client's behalf, so long as the facts giving rise to the claim are verified personally and under oath by the claimant. *See, e.g.*, *Martin v. Leonhart*, 717 F. Supp. 2d 92, 95 (D.D.C. 2010) (administrative claim filed by attorney on claimant's behalf); *cf.* 18 U.S.C. § 983(b)(2)(A) (providing for attorneys in judicial civil forfeiture proceedings). This point is moot, however, because Paret appears to have failed to satisfy an express statutory requirement.

tion of forfeiture under a civil forfeiture statute." (emphasis added)). Here, Paret failed to file a timely claim, and so he lost his chance to have the issue of forfeiture decided by a court. There are cases suggesting that equitable tolling principles may be applied to the claim-filing deadline under § 983,[8] but Paret's failure to actually submit his filings has made me unable to determine whether applying such principles would be warranted.[9] Thus, while I think the result is unjust,[10] I find myself

---

**8.** *See, e.g.*, *In re Return of Seized $11,915 in U.S. Currency*, Civ. No. 12-398, 2012 WL 2921221, at *3 (S.D. Cal. July 17, 2012) (tolling claim-filing deadline where claimant had acted diligently); *United States v. $114,143.00 in U.S. Currency Seized from Michael J. Calash's Vehicle*, 609 F. Supp. 2d 1321, 1322–23 (S.D. Fla. 2009) (applying equitable tolling to a § 983 deadline).

**9.** Even if equitable tolling applied, and Paret's claim was deemed timely, I could not order the property returned to Paret. Instead, I could only vacate the orders of forfeiture and compel the Government to file a judicial civil forfeiture action. *See In re Return*, 2012 WL 2921221, at *3.

**10.** The Government's prosecution of Paret was a misstep. Though I find that it acted without malice, it should have known that its evidence was insufficient for conviction. But because it pursued a case that it could not prove, Paret spent several years in prison for which he will not be compensated. Moreover, he does not even have recourse to seek the return of a significant amount of property that the Government seized from him, despite the fact of his acquittal and the lack of nexus between the property and the "crime" of which Paret was acquitted. I have no jurisdiction to order the property's return, but the position that Paret

unable to do anything but dismiss Paret's property claims, as I have no jurisdiction to review the administrative order.

## III. Conclusion

For the reasons state above, Paret's statutory property claim and false arrest and imprisonment claims are DISMISSED. Furthermore, I find that Paret has failed to prove all of the elements of his malicious prosecution claim. Finally, the Court has already ordered dismissed his remaining claims. Judgment will be entered accordingly.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 23rd day of September, 2014.

S/ SILVIA CARREÑO-COLL

UNITED STATES MAGISTRATE JUDGE

---

finds himself in suggests that the civil asset forfeiture system may be broken. Indeed, I note that just last week two former directors of the Department of Justice's Asset Forfeiture Office published an op-ed regretting their role in building that regime. *See* JOHN YODER AND BRAD CATES, Op-Ed., *Government self-interest corrupted a crime-fighting tool into an evil*, WASH. POST, Sept. 18, 2014, *available at*, http://wapo.st/1mjYkQg.